**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARY BARNES,<br> Plaintiff,<br><br>v.<br><br>THE UNITED STATES SECRETARY OF<br>DEFENSE, PETER HEGSETH; THE UNITED<br>STATES DEPARTMENT OF DEFENSE,<br> Defendant. | Civil Action No. 23-cv-932 |

**FIRST AMENDED COMPLAINT**

Pursuant to the Court's Order and Memorandum Opinion, dated March 26, 2025, now comes Plaintiff, MARY BARNES ("Plaintiff"), by and through her attorney of record Paul V. Bennett of Bennett Legal Services, Inc. and hereby amends her Complaint against the United States Department of Defense (hereinafter "Defendant"), and states as follows:

**JURISDICTION**

1.    Plaintiff has timely initiated and exhausted her claims with Defendant's Equal Opportunity & Diversity Office ("EO") before filing the instant lawsuit.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

2.    Plaintiff contacted Defendant's Equal Opportunity & Diversity Office in a timely manner on June 24, 2021, 42 days after the May 13, 2021, meeting and notification discussed below.

3.    Plaintiff has filed this federal civil action within ninety (90) calendar days from the date Plaintiff received the Defendant's decision on Plaintiff's Motion for Reconsideration in connection with the Defendant's decision on Plaintiff's EEOC Appeal No. 2022001960.

1

4.      Therefore, Plaintiff has properly exhausted her administrative remedies and this complaint has been filed in a timely manner.

## BACKGROUND

5.      Plaintiff is African American, Sex Female, Born in 1959. Defendant was aware at all relevant times herein of Plaintiff's race, sex and age.

6.      Plaintiff is a former Chief, Accounts Payable, Supervisory Financial Specialist for the Agency's Office of the Chief Financial Officer ("CFO") at the Financial Management Division, ("FMD") and CFO, located in Washington D.C.

7.      Plaintiff was employed with the federal government for more than 38 years, from May 9, 1983 to August 31, 2021. From May 9, 1983 to July 12, 1985 Plaintiff worked at the Department of the Army Germany; from October 21, 1985 to November 23, 1996 Plaintiff worked at the Department of the Army Fort Meade; and from November 24, 1996 and August 31, 2021 at the Department of Defense.

8.      Plaintiff's job duties as the Chief of Accounts Payable, included, among others, the management of accounts payable civilian pay and vendor's daily functions. Plaintiff was the only GS13 supervisor that supervised two individual sections within the FMD. Furthermore, Plaintiff was responsible for the planning, assigning and monitoring work assigned to personnel on the accounts payable team and the quality and quantity of the work they produced. In addition, Plaintiff ensured appropriate research and interpretation of federal regulations, policies and procedures that directly related to Civilian Pay and Vendor's funds, benefits and entitlements affecting financial services related to allowances paid towards customer's paychecks. Plaintiff also oversaw training and briefing as well as provided continuing briefing to newly arrived employees as needed.

9.      At all times relevant hereto, Plaintiff met or exceeded the reasonable performance expectations for her position. Plaintiff consistently received outstanding performance reviews, the highest possible level of performance, and was never placed on a performance improvement plan. Plaintiff was never written up for a poor performance.

10.      From in or around 2011 until Plaintiff's retirement in 2021, Plaintiff endured a continuing pattern of harassment, an on-going hostile work environment and continuing discrimination while employed by Defendant.

11.      Plaintiff suffered an on-going retaliation while employed by Defendant from in or around 2011 until Plaintiff's retirement on August 31, 2021, due to Plaintiff's EO's activities.

12.      During her employment with Defendant, Plaintiff was classified as GS13 employee which is the 13th paygrade in the General Schedule (GS) pay scale, the pay scale used to determine the salaries of most civilian government employees. The GS13 pay grade is generally reserved for top-level positions such as supervisors, high-level technical specialists, and top professionals holding advanced degrees. Nevertheless, Plaintiff met the criteria for a GS14 employee/supervisor, which is a higher pay scale than GS13.

13.      Due to the problem of her having issues receiving her GS13, Plaintiff met with the Director of the Agency, at the time (2013/2014) that was General M. F., the OHR Chief, Ms. H. the CFO Chief, Ms. S. W. and the Chief of the Defense Program Support Activity (DPSA) Office, Mr. E.

14.      During that meeting, General M. F. pointed his finger at Mr. E and stated that he (Mr. E.) was the problem, saying that he heard that everywhere, and how Mr. E. was the reason for the issues they were having. He then stated that he would send the Inspector General's (IG)

office to Plaintiff's building to perform an inspection in reference to their complaints. After the inspection Mr. E. was removed from his position.

15.    On information and belief, Plaintiff alleges that out of hundreds of CFO supervisors, Plaintiff, and other supervisors within FMD (Two African American Males and Four Minority Females) were the only supervisors that were not in a GS14 billet.

16.    On information and belief, Plaintiff alleges that in or around 2013/2014, FMD was placed under CFO management. Plaintiff alleges that from 2014 through 2017, CFO management repeatedly stated that special reviews were performed on the positions within FMD and that the reviews performed deemed the grades for FMD positions. The FMD supervisors, including Plaintiff, requested copies of the reviews; however, CFO management failed to produce the reviews for the FMD supervisors to view.

17.    In 2015, during a FMD meeting with the Chief of CFO[1], Race African American, Sex Male, 50 to 60 years old, Plaintiff questioned why Plaintiff and the other GS13 supervisors[2] (Two African American Males and Four Minority Females) were not GS14s. Plaintiff was told that they did not work within the beltway. Further, during an all-hands supervisors meeting in 2016/2017 with the same Chief of CFO, Plaintiff asked the same question to the Deputy Chief of CFO[3], but she was not given the opportunity to answer, the Chief of CFO (Race African American, Sex Male) stood and stated that the meeting was over.

18.    After years of fighting with the Chief Financial Officer ("CFO"), management's unwillingness to take action to see that Plaintiff was paid equally to her position, in 2018/2019

---

[1]    The name of the Chief of CFO cannot be disclosed due to security reasons.
[2]    The names of the other GS13 Supervisors cannot be disclosed due to security reasons.
[3]    The name of the Deputy Chief of CFO cannot be disclosed due to security reasons.

she, along with other supervisors, decided to email the Director of the Agency ("the Director") and voice concerns regarding the lack of pay equality amongst CFO supervisors.

19.    Emailing the Director is the last step in the Agency Chain of Command. Upon contacting the Director, he appointed his Chief of Staff ("Chief of Staff") to take on the task.

20.    In or around 2019, through a series of emails to Plaintiff's supervisors and meetings with Plaintiff's supervisors, Plaintiff inquired about the equality of Defendant's grading structure.

21.    In or around January, 2020, the Chief of Staff[4] stated that Plaintiff and other supervisors should not continue working if they were working beyond their grade level.

22.    In addition, in or around January, 2020, the Chief of Staff further stated that a desk audit[5] had been performed and that Plaintiff's grade was valid at GS13. After sending the Chief of Staff a follow-up email asking for proof, he called for a follow up meeting which was when Plaintiff found out that no desk audit had been performed. At this time, January 2020, the CFO met with the Chief of Staff, Office of Human Resources ("OHR"), Ombudsman, the new CFO Chief and the CFO Deputy[6]. During this meeting the CFO Chief directed Plaintiff and the other supervisors to submit a desk audit to the OHR. Thereafter, the desk audits were completed and sent to the supervisors, who completed their portion and sent it to OHR. After the completion of the desk audits, Plaintiff had to constantly ask OHR and senior management for an outcome of the desk audits. After several meetings with management and no response about the desk audits, Plaintiff demanded the OHR desk audit manager to show up to meetings. Plaintiff was asked by the Chief of CFO, if the OHR desk audit manager was to show to the meetings and

---

[4]    The name of the Chief of Staff cannot be disclosed due to security reasons.
[5]    A desk audit is a formal procedure where the duties and position of a federal employee are evaluated to determine whether or not the employee's position should be upgraded or modified in terms of grade, pay level, title or classification series.
[6]    The names of the CFO, Chief of Staff, Ombudsman, the new CFO Chief and the CFO Deputy cannot be disclosed due to security reasons.

Plaintiff and the other supervisors were determined to be working at the higher grade level what was Plaintiff going to do, Plaintiff stated that she would decide when she received the information.

23.    On information and belief, Plaintiff alleges that in or around July/September 2020, during a meeting with the Chief of CFO, it was stated that there were two billets available for Finance. During the same meeting, the FMD Chief[7] indicated that she had not been with Finance very long, but did not believe the supervisors should be promoted.

24.    In or around January 2021, during a finance meeting with the Chief of CFO, it was stated that the two billets that were available for Finance would be redirected to a new standup, and that project was a priority. By this time all but two GS13 Finance Supervisors and the two GS13s within the Systems Accounting had received a "P"[8] for promotion, but CFO leadership decided not to place billets for upgrades within Finance at Plaintiff's location.

25.    In or around March 11, 2021, Defendant refused to upgrade Plaintiff's position from GS13 to GS14, and refused to increase Plaintiff's pay accordingly after Plaintiff's position was classified as equivalent to a GS14 level, Supervisory Financial Specialist.

26.    On information and belief, Plaintiff alleges that in or around March 11, 2021, Defendant failed to give Plaintiff a bonus in the amount of $10,000 for working at the GS14 level.[9]

---

[7]    The name of the FMD Chief cannot be disclosed due to security reasons.
[8]    In order for Defendant's employees/supervisors to become eligible for promotion, the employees/supervisors need to complete a promotion packet called Promotion Assessment Form ("PAF"). Once the packet is approved, the employees/supervisors receive a "P" which indicates that the employees/supervisors are eligible for promotion.
[9]    During a meeting with the CFO Chief, he had stated that if anyone was working at a higher grade level and wasn't paid at their rightful grade, they usually gave $10,000 bonuses to accommodate the lack of pay.

27.     On information and belief, Plaintiff alleges that from March 24, 2021, through May 13, 2021, Defendant failed to act on Plaintiff's request to upgrade Plaintiff's position to GS14.

28.     Throughout the process Plaintiff (and the other supervisors who joined her in the email), were told that their grades were not warranted, only to follow up with proof as to why they were and should be at the higher pay grade. The Chief of Staff directed CFO management, Office of Human Resources ("OHR"), the Ombudsman's Office ("Ombudsman"), and Plaintiff and the other supervisors to have a meeting to come up with a way to satisfy the pay inequality issue. The CFO Chief ("CFO Chief") directed a Desk Audit be performed for all supervisors involved.  This whole process culminated with Plaintiff (and the other supervisors) meeting with General B on May 13, 2021.

29.     The May 13, 2021, meeting with General B included summarizations and discussions regarding the following:

a.     That once the Desk Audits were performed and several meetings during and after, CFO management refused to bring the OHR Supervisor ("OHR Supervisor") and/or the OHR Specialist ("OHR Specialist") that performed the Desk Audit to any of Plaintiff and the other supervisors' meetings with them to explain the outcome of the Desk Audit, a demand for the OHR supervisor and specialist's attendance to get answers was made to Leadership.  Once the demand was made and OHR Specialist attended the teleconference meeting with all in attendance, Plaintiff and the other supervisors found out that they were indeed qualified for the higher pay grade (GS14).

b.      That, after finding out that the Desk Audit verified the internal complaints (made since 2014) and stated that Plaintiff and the other supervisors were working at the GS14 grade level, CFO Chief refused to upgrade their positions.

c.      That since starting the complaint with the Director of the Agency, (as part of the Chain of Command and final Agency step in the Chain), Plaintiff and the other supervisors decided to also end their complaint with the new Director of the Agency. But, by this time the Director's position had changed to the New Director.

d.      That an email from the Chief of Staff, Mr. J.S. informed Plaintiff and the other supervisors that he requested OHR to review each position description, and all the performance objectives associated with the GS13 and GS14 Supervisory Financial Specialist positions within the CFO branch.

e.      That upon completion of the review, OHR determined the duties and responsibilities for each position aligned with the narrative description of the work contained in the corresponding position.  This included the work levels, occupational series, titles and grades are appropriate for the work being performed. He stated that the grade conversion table used was Volume 2007, Appendix 4 and identifies to the Grade that corresponds to the point total.

f.      That a follow-up email, from Plaintiff and the other supervisors explained why his justification was incorrect and another evaluation should be performed, and Chief of Staff, Mr. J.S. he agreed.

g.      That during the follow-up meeting when asking OHR manager Ms. M. H. if they had performed any type of Review or Audit on Plaintiff and the other supervisors'

positions, she said they had not, she said that the email from the Chief of Staff, Mr. J.S. stating they had performed a Review and Audit was false.

        h.      That there were emails to General A and the New Director, General S. B. and their staff, including emails that pertained to Plaintiff's and the other supervisors' meeting with management, a copy of the Desk Audit stating that Plaintiff and other supervisors were indeed working at the higher grade level (GS14), the Director's Duty to Act Pledge, a copy of the Desk Audit that was performed for her employees showing their approval for promotion, and that a Desk Audit is a valid way to justify pay grades and Plaintiff's EO complaint.

30.      Upon his taking command, the New Director directed all supervisors to sign a Duty to Act Pledge. However, when Plaintiff had her TANDBERG meeting (Video Teleconference) with the Director to state her complaint about management's refusal to act on a favorable Desk Audit, directed by his office, he said he would love to see her promoted, but since she'd written their portion, he would not be changing the agency's policy for her to receive the Accretion of Duty Pay, even though it had been proven by the Desk Audit. (Plaintiff signed her Duty to Act Pledge, on May 21, 2021.)

31.      Plaintiff explained to the Director in the May 13, 2021, meeting, that she and the other supervisors had written their portion because that was the process to perform a Desk Audit and that they were directed by CFO Leadership to perform the task at hand. She further explained that once they completed their portion, the relevant supervisors would perform theirs, OHR would interview the supervisors individually and then interview each supervisor's supervisor for their input prior to a final OHR decision to whether the positions should be upgraded/demoted/or stay as is. Plaintiff also explained that it was the same process used for her

employees years earlier (originally denied and appealed) and they were upgraded to a higher pay grade.

32.    One of Plaintiff's previous complaints against management was to receive her GS13. She met with the Chief of OHR Ms. H. (in 2013) and then shortly afterward with the Deputy Director to prove that she should be promoted, and prior to leaving the Deputy Director's office, the OHR Chief called and informed the Deputy Director to let her know that she would receive her GS13. No EEO complaint was filed, but Plaintiff did have to use the Chain of Command to rightfully receive her promotion.  Plaintiff detailed her issues, such as this, with prior leadership, during the meeting with General B on May 13, 2021.

33.    The CFO Chief, Ms. S. W. became the Deputy Director (in or around 2014) and would become the Deputy Director to General A and General S. B. during the filing of Plaintiff's (and the other supervisors) complaint and Desk Audit process.  This time frame includes up through May 13, 2021.

34.    The Director, General S. B. having forced all managers/supervisors within the agency to sign a Duty to Act Pledge,  then was the one to refuse to uphold it when it came to six GS13 CFO Supervisors seeking Equality and proven by his very own OHR Department to be working at the higher grade level.  While this occurred prior to the May 13, 2021, meeting, it was summarized to General B during that meeting.  In fact, this was ultimately the reason they came to General B (because of the Duty to Act Pledge).

35.    With written proof of the Desk Audit, and Director, General S. B's Duty to Act Pledge, he allowed senior management to fail in their responsibilities to ensure that Plaintiff and the other supervisors were paid according to their appropriate scale level, and he wouldn't uphold his own pledge thus failing Plaintiff and the other supervisors as the Highest-Ranking

Agency Leader.  Plaintiff and the other supervisors learned that he wouldn't uphold the pledge, during the above-discussed May 13, 2021, meeting.

36.     Plaintiff was finally told she was indeed working at the higher grade level GS14, Plaintiff and the other supervisors were also informed that they would not get promoted, because the Defendant no longer acknowledged desk audits as a means for upgrades/accretion of duties. All of this was discussed during the above-referenced May 13, 2021, meeting at which General B decided not to do anything.

37.     Upon hearing this information, Plaintiff and the other supervisors decided to email the new Director[10], Lieutenant General (Race White, Sex Male, Age late 40s or early 50s), and requested a meeting. The new Director was the leader of the Agency, and one of his first actions was to have all supervisors sign a Duty to Act Pledge. Further, the new Director oversaw all departmental agencies within the Defendant, the CFO, OHR, FMD, Ombudsman, OIG, EO, and Security. Plaintiff thought that he as the author of the Pledge and the agency's leader, would act and uphold his own Pledge. Nonetheless, the new Director did not take any actions to remedy Plaintiff's situation, subsequent to the May 13, 2021.

38.     On or about June 24, 2021, Plaintiff complained to the EO about Defendant's refusal to upgrade Plaintiff's position and pay. On June 28, 2021, Plaintiff had an intake with the EO.

39.     During the months of July and August of 2021, due to Defendant's failure to timely address Plaintiff's complaints, Plaintiff contacted the Office of the Inspector General ("OIG").  Subsequently, Plaintiff was informed by the OIG that they wanted to meet with

---

[10]     The name of LTG cannot be disclosed due to security reasons.

Plaintiff sometime in August 2021. On information and belief, Plaintiff alleges that as of October 8, 2021, the OIG failed to follow up with Plaintiff concerning Plaintiff's EO complaint.

**COUNT I**
**RACE DISCRIMINATION**
**(Disparate Treatment)**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, *et seq.***

40.     Plaintiff hereby restates and incorporates paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41.     Plaintiff is a member of a protected class, African American, throughout the time of the subject discriminatory acts.

42.     Plaintiff was qualified and satisfactorily performed her duties as a Supervisory Financial Specialist under the employ by the Defendant.

43.     Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of her Race African American.

44.     That Defendant carried out the aforementioned acts of discrimination against Plaintiff on the basis of her Race African American - a protected class under Title VII.

45.     That the aforementioned acts constitute unlawful practices pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.

46.     That the effect of the practices complained of above deprived Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her Race - African American.

47.     That similarly situated non-African American employees such as Plaintiff's direct supervisor (GS14 supervisor White, Female, in mid 30s to 40s) outside the protected class, was not subjected to the same or similar adverse employment actions that Plaintiff endured.

12

48.     That the intentional discriminatory actions of Defendant, as alleged above, were done with malice and/or with reckless indifference to Plaintiff's rights.

49.     As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages, employment benefits, emotional distress, attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT II**
**SEX DISCRIMINATION**
**(Disparate Treatment)**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, *et seq.***

50.     Plaintiff hereby restates and incorporates paragraphs 1 through 39 of this Complaint as though fully set forth herein.

51.     Plaintiff is a member of a protected class, Female, throughout the time of the subject discriminatory acts.

52.     Plaintiff was qualified and satisfactorily performed her duties as a Supervisory Financial Specialist under the employ by the Defendant.

53.     Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of Plaintiff's Sex Female. Specifically, Defendant refused to upgrade Plaintiff's level and classification series from GS13 to GS14 Supervisor and refused to pay Plaintiff a higher pay grade although Plaintiff's job duties were commensurate of those of a GS14 Supervisor.

54.     That Defendant carried out the aforementioned acts of discrimination against Plaintiff on the basis of her Sex Female - a protected class under Title VII.

55. That the aforementioned acts constitute unlawful practices pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.

56. That the effect of the practices complained of above deprived Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her sex- Female.

57. That similarly situated non-Female employees such as Plaintiff's direct GS14 supervisor's husband[11] that started as a new federal employee at FMD, who was hired as a GS13 supervisor, was paid what a GS14 supervisor earned walking in the door and who was outside the protected class, was not subjected to the same or similar adverse employment actions that Plaintiff endured.

58. That the intentional discriminatory actions of Defendant, as alleged above, were done with malice and/or with reckless indifference to Plaintiff's rights.

59. As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT III**
**VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (ADEA)**
**29 U.S.C.S. § 621 et seq.**

60. Plaintiff hereby restates and incorporates paragraphs 1 through 39 of this Complaint as though fully set forth herein.

61. Plaintiff is a member of a protected class, YOB: 1959, throughout the time of the subject discriminatory acts.

---

[11] The name of Plaintiff's direct GS14 supervisor's husband cannot be disclosed due to security reasons.

62.     Plaintiff was qualified and satisfactorily performed her duties as a Supervisory Financial Specialist under the employ by the Defendant.

63.     Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of Plaintiff's age, YOB: 1959, in violation of the ADEA.

64.     That the effect of the practices complained of above deprived Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her age, YOB: 1959.

65.     That similarly situated younger employees such as Plaintiff's GS14 supervisor and a previous FMD GS14[12] supervisor that worked at headquarters and returned to FMD to occupy one of the newly created GS14 positions, who were outside the protected class, were not subjected to the same or similar adverse employment actions that Plaintiff endured, including, but not limited to, being given unwarranted discipline and held to a higher standard in the job performance.

66.     The Defendant's acts were carried out with malice and reckless disregard for Plaintiff's protected civil rights.

67.     As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, attorney's fees and litigation costs.

---

[12]    The name of the previous FMD GS14 supervisor cannot be disclosed due to work status.

**COUNT IV**
**RETALIATION**
**(Adverse Actions and Disparate Treatment)**
**Title VII of the Civil Rights Act of 1964**
**(Race, Sex, and Prior EEO Activities)**
**42 U.S.C. § 2000e, *et seq.***

68.    Plaintiff hereby restates and incorporates paragraphs 1 through 39 of this Complaint as though fully set forth herein.

69.    Plaintiff's protected activities have been numerous, processed and investigated over the course of years, pertaining to, but not limited to, hostile work environment, denials of promotional opportunities and wage increase, based upon her Race African-American, Sex Female, YOB:1959 and in retaliation for prior EO activities dating back to 2011.

70.    Plaintiff complained to her supervisors and the Defendant's EO about Defendant's refusal to upgrade Plaintiff's position and pay on multiple occasions throughout her employment with Defendant and particularly in 2015, 2019, 2020 and 2021 (Plaintiff retired on August 31, 2021). As a result of Plaintiff's complaints, Defendant retaliated against Plaintiff by continuing to refuse to take action and resolve Plaintiff's situation.

71.    The subsequent adverse employment actions and disparate treatment, as set forth in the above-referenced facts common to all counts, amounted to illegal retaliation based upon the frequency of retaliatory conduct, temporal proximity to continuous protected activities and retaliatory animus of Defendant's management.

72.    That the aforementioned acts of retaliation for complaining of discrimination constitute unlawful employment practices pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

16

73. The aforementioned legally protected activities were known by upper management to have occurred.

74. That the intentional retaliatory actions complained of above were done with malice and/or with reckless indifference to Plaintiffs rights.

75. That the effect of the practices complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee based upon her legally protected activities.

76. As a direct and proximate result of the Defendant's retaliatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**PRAYER FOR DAMAGES**

WHEREFORE, for the foregoing reasons, Plaintiff, demands judgment against Defendant, as follows:

1. Compensatory damages for lost wages and benefits in the amount of $300,000;

2. Emotional distress according to proof;

3. Prejudgment and post judgment interest;

4. Removal of any adverse actions from her personnel file;

5. Award attorney's fees and costs, including expert witness fees, as allowed by law;

6. Award past and future non-economic damages for all claims as allowed by law, in an amount to be determined at trial, including, but not limited to, lost earnings capacity, mental suffering, emotional distress, loss of enjoyment of life, humiliation, loss of reputation, and inconvenience;

7.      And for such other and further relief as this Honorable Court deems just and equitable.

Dated:  April 28, 2025                    Respectfully submitted,

*Paul V. Bennett*

_____
Paul V. Bennett, Esq., (DC Bar No. 427358)
Bennett Legal Services, Inc.
5457 Twin Knolls Road, Suite 300
Columbia, Maryland 21045
Telephone: 410.353.4994
Email: pbennett@bennettlaw.net
*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in the above referenced matter for all Counts triable by right thereof.

Dated:  April 28, 2025                    Respectfully submitted,

*Paul V. Bennett*

_____
Paul V. Bennett, Esq., (DC Bar No. 427358)
Bennett Legal Services, L.L.C.
5457 Twin Knolls Road, Suite 300
Columbia, Maryland 21045
Telephone: 410.353.4994
Email: pbennett@bennettlaw.net
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 28th  day of April, 2025, that the attached **PLAINTIFF'S FIRST AMENDED COMPLAINT**, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and copies will be sent to those indicated as non-registered participants.

By:    *Paul V. Bennett*
               Paul V. Bennett